# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

JAMES AMBROSE,              :
                                   :
          Plaintiff       :     No. 3:14-CV-1618
                                   :
       vs.                 :     (Judge Nealon)
                                   :
CAROLYN W. COLVIN, Acting  :
Comissioner of Social Security,[1]  :
                                   :
         Defendant     :

## MEMORANDUM

On August 18, 2014, Plaintiff, James Ambrose, filed this instant appeal[2] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI")[3] under Titles II and XVI of the Social Security Act,42 U.S.C. § 1461, et seq and 42

---

1. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is substituted for "Commissioner of Social Security" as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

3. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

U.S.C. § 1381 et seq, respectively. (Doc. 1). The parties have fully briefed the

appeal. For the reasons set forth below, the decision of the Commissioner denying

Plaintiff's applications for DIB and SSI will be affirmed.

## BACKGROUND

Plaintiff protectively filed[4] his applications for DIB and SSI on October 21,

2011. (Tr. 13).[5] These claims were initially denied by the Bureau of Disability

Determination ("BDD")[6] on April 10, 2012. (Tr. 13). On April 30, 2012, Plaintiff

filed a written request for a hearing before an administrative law judge. (Tr. 13).

A hearing was held on December 11, 2012 before administrative law judge Donald

M. Graffius ("ALJ"), at which Plaintiff and an impartial vocational expert, Irene

H. Montgomery ("VE"), testified. (Tr. 13). On February 26, 2013, the ALJ issued

a decision denying Plaintiff's claims because, as will be explained in more detail

infra, Plaintiff could perform light work as defined in 20 CFR 404.1567(b) and

---

4. Protective filing is a term for the first time an individual contacts the Social
Security Administration to file a claim for benefits. A protective filing date allows
an individual to have an earlier application date than the date the application is
actually signed.

5. References to "(Tr. _)" are to pages of the administrative record filed by
Defendant as part of the Answer on October 31, 2014. (Doc. 12).

6. The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social
Security Administration.

416.967(b), except that the Plaintiff was:

> limited to occasional walking and standing. [Plaintiff] must avoid kneeling, crouching, crawling, and climbing ladders, ropes, and scaffolds.  He can occasionally perform other postural maneuvers.  He must be afforded the option to sit and stand during the workday, one to two minutes every thirty minutes or so.  He must avoid pushing and pulling with the extremities.  He is limited to occupations which do not require exposure to dangerous machinery and unprotected heights due to narcotics usage.  He is limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes.

(Tr. 18).

On April 26, 2013, Plaintiff filed a request for review with the Appeals Council.  (Tr. 8-9).  On June 12, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review.  (Tr. 1-3).  Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on January 23, 2013.  (Doc. 1).  On October 31, 2014, Defendant filed an answer and transcript from the Social Security Administration ("SSA") proceedings.  (Docs. 11 and 12).  Plaintiff filed a brief in support of his complaint on December 15, 2014.  (Doc. 13).  Defendant filed a brief in opposition on January 14, 2015.  (Doc. 14).  Plaintiff filed a reply brief on January 28, 2015.  (Doc. 15).  The matter is now ripe for review.

Plaintiff was born in the United States on June 18, 1960, and at all times relevant to this matter was considered a "an individual closely approaching advanced age."[7]   Plaintiff obtained his high school diploma, and can communicate in English.  (Tr. 231, 233).  His employment records indicate that he previously worked as a furnace operator, a construction worker, and for Asplundh as a tree sprayer.  (Tr. 219).  The records of the SSA reveal that Plaintiff had earnings in the years 1978 through 2011.  (Tr. 190).  His annual earnings range from a low of four hundred twenty-nine dollars and forty-eight cents ($429.48) in 1981 to a high of thirty-two thousand three hundred six dollars and twenty cents ($32,306.20) in 2005.  (Tr. 190).  His total earnings during those thirty-three (33) years were four hundred fifty-six thousand seven hundred four dollars and ninety-four cents. ($456,704.94).  (Tr. 190).

Plaintiff's alleged disability onset date is July 21, 2011.  (Tr. 13).   The impetus for his claimed disability is a combination of the following: spinal stenosis, bulging discs, degenerative bone disease, and a torn meniscus in the right knee.  (Tr. 232).

---

7.  "Person closely approaching advanced age.  If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work."  20 C.F.R. 404.1563(d).

In a document entitled "Function Report - Adult" filed with the SSA, Plaintiff indicated that he lived in a house with his family, including his three (3) year old son. (Tr. 240). He noted that he took care of his three (3) year old son and pets. (Tr. 241). His fiancé and mother helped him take care of his son and animals. (Tr. 241). He could take care of his personal care needs, such as showering and getting dressed, without any problems, assistance, or reminders. (Tr. 241-242). He did not prepare his own meals, but was able to mow the lawn using a riding lawn mower for a total of three (3) hours weekly. (Tr. 242). Plaintiff left the house daily, was able to drive, and was able to go out alone. (Tr. 243). He shopped for groceries once a month for about two (2) hours. (Tr. 243). He could count change, pay bills, and use a checkbook, but was unable to handle a savings account because he had no savings. (Tr. 243).

Regarding his concentration and memory, Plaintiff needed special reminders to take his medicine. (Tr. 242). He could not finish what he started, did not follow written or spoken instructions well, did not handle stress well, and handled changes in routine "ok." (Tr. 245-246).

Socially, Plaintiff watched sports on the television about once a week because sitting caused severe headaches. (Tr. 244). He indicated that he did not spend time with others, and did not go anywhere on a regular basis. (Tr. 244). He

reported that he had no problems getting along with family, friends, neighbors, or others.  (Tr. 245-246).  In the function report, when asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did not check bending, standing, reaching, walking, talking, hearing, stair climbing, seeing, memory, concentration, understanding, or following instructions.  (Tr. 245).

Plaintiff also completed a Supplemental Function Questionnaire.  (Tr. 248).  He stated that his pain began five (5) to six (6) years earlier due to spinal stenosis.  (Tr. 248).  His pain included headaches, pain in his neck, arms, and shoulders, and tension in general.  (Tr. 248).  The activities that caused him to have pain were lifting, using his arms, and sitting.  (Tr. 248).  His pain was constant, and was worse on some day than others.  (Tr. 248).  He stated he was taking Percocet for pain management four (4) times daily since 2008, but that sometimes the pain medicine did not relieve his pain.  (Tr. 249).  Other things he had done to relieve the pain included physical therapy, use of a heating pad, and massage therapy.  (Tr. 249).

At his hearing, Plaintiff was living in a house with his son, who was four and a half (4 ½) years old at the time, but was separated from his fiancé.  (Tr. 36).  He indicated he drove about four (4) times a month, and that he drove three (3) hours to his hearing, but that driving for this length of time caused numbness in

his hands and arms and severe headaches.  (Tr. 37, 54).  His mom helped him take

care of his son, and they both had temporary custody over him.  (Tr. 37-38).  He

stated that he read the newspaper for about ten (10) minutes a day, and that he

watched sports on television.  (Tr. 37).  He indicated that he went back to work in

May or June of 2012, and this three (3) day work project consisted of "ripping

down a black iron and plastered ceiling."  (Tr. 39).  When questioned as to why

wages were reported in 2011 from RNL Development for dates that occurred after

July 21, 2011, Plaintiff's alleged onset date, Plaintiff responded that he shouldn't

have been receiving wages from this company, and that maybe it was because he

worked there until August 13, 2011, when his knee gave out.  (Tr. 40).  He then

recalled that RNL Development gave him a workers' compensation settlement that

would account for the 2011 third quarter wages of four thousand five hundred

seventy dollars ($4,570.00).  (Tr. 41-42).  He received ten thousand two hundred

sixty-six dollars in the 2011 fourth quarter from Hayes Mechanical in the form of

workers' compensation settlement also.  (Tr. 41-42).  He stated that in his last job,

he worked as a construction worker, which included demolition work of brick and

stone, and pouring and constructing concrete and pavement.  (Tr. 43).  Since his

alleged onset date of July 21, 2011, other than the three (3) day work period, he

did not work in any other job, but did receive unemployment compensation.  (Tr.

44).  In terms of doctors' visits, he indicated that he visited Dr. Eshbach every two

(2) to three (3) months.  The ALJ pointed out what Dr. Eshbach, in July of 2012,

states "Work status: full-time.  Knee is feeling much better.  Will hold off on

Supartz."  (Tr. 45).  Plaintiff responded to the ALJ's statement regarding Dr.

Eshbach's notes that Dr. Eshbach told him that as long as he could walk on it and

it didn't swell up, to leave it alone.  (Tr. 45).  Then Plaintiff said that Dr.

Eshbach's notes did not make sense because he said that Dr. Eshbach had told him

that he had "some bad news" for him, which was that he would need a knee

replacement.  (Tr. 45-46).  He testified that he saw Dr. Sacks every three (3)

months.  (Tr. 46).  The ALJ pointed out that Dr. Sacks notes, in May of 2012,

stated that Plaintiff went hunting over the weekend.  (Tr. 46).  The ALJ then

questioned Plaintiff as to why he was dismissed as a patient by Dr. McCann and

Dr. Tandon, and he responded that it had something to him not knowing he was

not allowed to receive Percocet from them.  (Tr. 46-47).  When questioned by the

ALJ as to why he felt he could not engage in any work activity, he responded that

it was due to the constant headaches, numbness in his hands, pain down his arms

and in between his shoulders up to his head, and pain in his knee with every step

he took.  (Tr. 48).  He stated that he could probably walk one (1) mile, but that he

would have pain with every step.  (Tr. 48).  The ALJ highlighted that Plaintiff

stated in May of 2012 that he could walk two (2) miles, and Plaintiff responded, "Oh, roughly I guess." (Tr. 48). He testified that he could stand for an hour or two (2), and that he could sit for thirty (30) to forty-five (45) minutes. (Tr. 49). He stated that he could lift and carry probably ten (10) to twenty (20) pounds. (Tr. 49). He testified that he was able to take care of his personal needs, cook, do the dishes, vacuum the floor, dust, wash clothes, shop for groceries, mow the lawn, visit his mother and father, fish once in a while, deer hunt, and attend his son's school events. (Tr. 50-51). On a typical day, Plaintiff testified that he got his son ready for school, cleaned up the house until his son returned home at noon, and then would visit his parents, play games with his son, or mow the lawn. (Tr. 51-52).

## **MEDICAL RECORDS**

On August 8, 2011, Plaintiff presented to the emergency room ("ER") at Clearfield Hospital due to right knee pain. (Tr. 265). His past medical history listed that Plaintiff had a history of hypertension, hypercholesterolemia, carpel tunnel syndrome, spinal stenosis, disc problems, and surgery on his bicep muscle and for carpel tunnel release. (Tr. 265). In the Notes section, it was stated that Plaintiff indicated that he hurt his leg a month prior at work, and then the day before, when he hopped up onto a pile of dirt while playing with his

grandchildren, he heard his knee pop and experienced a sudden onset of pain.  (Tr. 266).  He also complained of pain in his right hip, but did not notice any swelling in his knee until seven (7) days after the injury occurred.  (Tr. 266).  An exam revealed limited range of motion ("ROM") in his knee due to pain and stiffness, but that Plaintiff was still able to bend his knee and ambulate it with difficulty, and he had normal sensations in his extremities.  (Tr. 266).  He stated that he was taking Percocet and Naproxen for the pain that seemed to help.  (Tr. 266-267).  An x-ray was taken of Plaintiff's right knee, and revealed minimal degenerative changes in the knee with small knee joint effusion.  (Tr. 268).  Plaintiff's knee was wrapped in an Ace bandage.  (Tr. 267).

On August 29, 2011, Plaintiff underwent an MRI of his lower extremities.  (Tr. 273).  This MRI revealed the following: (1) a tear of the posterior horn of the right medial meniscus; (2) effusion; (3) patellar cartilage fissure with associated small areas of bone edema; (4) moderate contusion of the medial to midtibial plateau; (5) septated cystic changes, suggestion a ganglion adjacent to the medial and posterior medial tibial plateau; and (6) fairly mild subcutaneous edema medially and anteromedially is not specific, but a grade I MCL sprain could not be ruled out.  (Tr. 273-274).

On September 2, 2011, Plaintiff had an appointment with Ted Eshbach,

M.D. at Elk Regional Professional Group for evaluation of his tear in his right meniscus. (Tr. 342). Dr. Eshbach stated that given Plaintiff's symptoms and history, as well as the changes in his MRI, he recommended Plaintiff undergo an arthroscopy to deal with his torn meniscus symptoms. (Tr. 342).

On September 8, 2011, Dr. Eshbach performed an arthroscopy on Plaintiff's right torn meniscus. (Tr. 343). On September 20, 2011, Plaintiff had a post-surgical visit with Dr. Eshbach, and reported that he was still having some pain in his knee mainly medially, and was walking with a somewhat stiff-kneed antalgic gait. (Tr. 345). His exam revealed a small effusion with minimal tenderness alone the medial joint line. (Tr. 345). He expected Plaintiff's difficulty with ambulating and climbing stairs to resolve. (Tr. 345). Dr. Eshbach prescribed physical therapy for Plaintiff and scheduled a re-check for three (3) weeks later. (Tr. 345). He also stated that, at present, Plaintiff was not ready to return to his regular duties at work. (Tr. 345).

On September 14, 2011, Plaintiff presented to Dubois Regional Medical Center for neck pain that he rated at a seven (7) on a pain scale of one (1) to ten (10). (Tr. 319). He described the pain as sharp and aching with intermittent numbness and tingling going down his arms into his fingers. (Tr. 319). He indicated the pain was worse when he was working and when he turned his head at

11

certain angles.  (Tr. 319).  He stated he also recently had right knee meniscus surgery on August 28, 2011, and had been prescribed Percocet and Vicodin for his pain, but that Dr. Maloney would no longer prescribe him pain medication.  (Tr. 319).  He also complained of bilateral intermittent weakness in his upper extremities.  (Tr. 319).  He stated that his cervical epidural steroid injection in March of 2011 was helpful, but that his injection in July of 2011 was not helpful.  (Tr. 319).  It was noted that his knee incision was covered with a knee brace, and that it was clean, dry, and intact.  (Tr. 320).  Dr. McCann prescribed his Percocet,a and scheduled an epidural injection for October of 2011.  (Tr. 320).

On October 18, 2011, Plaintiff underwent an epidural injection into his spine.  (Tr. 297).  This procedure was performed at Dubois Regional Medical Center by Spring McCann, M.D.  (Tr. 297, 316).  His pre-op and post-op diagnoses included neck pain, upper extremity radiculopathy, cervical degenerative disc disease ("DDD"), and a cervical disc bulge.  (Tr. 316).  It was noted that Plaintiff was prescribed Percocet and Neurontin, and that after being off from work due to knee surgery, he would be going back to work "in the next few days."  (Tr. 317).

On October 19, 2011, Plaintiff had a follow-up with Dr. Eshbach, who recommended that Plaintiff abstain from work for two (2) more weeks.  (Tr. 346).

Dr. Eshbach stated that Plaintiff's knee was getting better, that it bothered him occasionally, and that his exam revealed a relatively small effusion with a good ROM. (Tr. 346). Plaintiff rejected Dr. Eshbach's offer to have his knee injected. (Tr. 346).

On November 1, 2011, Dr. McCann of the Dubois Pain Management Group sent Plaintiff a letter. (Tr. 308). This letter stated that Dr. McCann would no longer be prescribing opiates to Plaintiff because he broke his opioid agreement by obtaining opioids from another provider and at a pharmacy other than the one specified in the agreements. (Tr. 308). Dr. McCann stated that he would only see Plaintiff for nonopioid therapy only. (Tr. 308).

On November 11, 2011, Plaintiff had a follow-up appointment with Dr. Eshbach. (Tr. 347). It was stated that Plaintiff's knee was continuing to get a bit better and that Plaintiff did return to work on his own. (Tr. 347). On exam, there was a small effusion, six (6) cc's of fluid were removed from Plaintiff's knee, and there appeared to be a small amount still unretrieved. (Tr. 347). Dr. Eshbach injected Plaintiff's knee with Marcaine and Depo-Medrol. (Tr. 347).

On February 12, 2012, Plaintiff had an appointment with Dr. Eshbach. (Tr. 348). It was reported that Plaintiff had been doing well for the prior two (2) to three (3) months after his knee was aspirated and injected, but that his knee began

13

aching again.  Dr. Eshbach injected Plaintiff's knee with Marcaine and Depo-Medrol, and Plaintiff was scheduled for a follow-up.  (Tr. 348).

On March 21, 2012, Plaintiff underwent an examination for disability determination that was performed by Jawahar Suvarnakar, M.D.  (Tr. 328).  Plaintiff told Dr. Suvarnakar that he had cervical and lumbar pain for the last eight (8) years, and was told that he had possible cervical and lumbar arthritis.  (Tr. 328).  He complained of pain and headaches.  (Tr. 328).  No surgery was ever discussed or offered, and he had no further studies performed for the last several years regarding his back.  (Tr. 328).  He rated his cervical and lumbar pain at a five (5) out of ten (10).  (Tr. 328).  He also complained of an episode of numbness and tingling in both of his upper extremities that was exacerbated with physical activity and the position of his neck.  (Tr. 328).  He also complained of shoulder pain.  (Tr. 328).  He described his lumbar pain to occur on sitting and standing and to be one that was dull and chronic in nature without radiation, tingling, numbness, or weakness.  (Tr. 329).  Regarding his right knee, Plaintiff stated that he had undergone two (2) needle drainages recently, and may be getting another drainage in the future.  (Tr. 329).  He complained that his knee was in pain and was stiff "all the time," and that walking and climbing stairs was difficult and painful.  (Tr. 329).  He also claimed that he had right shoulder and arm pain for the

last several years, and had surgery done in 2004.  (Tr. 329).  He stated that his pain was more with repeated right arm movement.  (Tr. 329).  His past surgical history included carpel tunnel surgery, arthroscopic surgery, and surgery for his right bicep muscle.  (Tr. 329).  A physical exam of his extremities was negative for edema and tenderness, an exam of his cervical spine revealed minimal tenderness on the lower cervical spine area with a normal ROM on flexion, extension, and lateral rotation, and exams of his thoracic and lumbar spines were normal.  (Tr. 331).  His right shoulder was tender at the bicipital area near a surgical scar, and there was a slight loss of muscle mass of the biceps and triceps on the right side, but Plaintiff had normal ROM of both shoulders and elbows.  (Tr. 331).  His right knee had minimal swelling and tenderness medially on palpitation with slightly painful ROM.  (Tr. 331).  The clinical impressions from this visit were that Plaintiff had cervical arthritis with chronic pain, episodic radicular pain, and low back pain syndrome.  (Tr. 331).  Dr. Suvarnakar opined that Plaintiff was limited to carrying and lifting ten (10) to twenty (20) pounds, had no limitations with standing, walking, sitting, pushing and pulling, or any other physical functions.  (Tr. 333-334).  Dr. Suvarnakar also opined that Plaintiff could frequently kneel, bend, stoop, crouch, balance, and climb.  (Tr. 334).

On April 3, 2012, Plaintiff's medical records were reviewed by state agency

15

physician Abu N. Ali, M.D., who completed a Physical RFC Assessment form.

(Tr. 70).  Dr. Ali opined that, in an eight (8) hour workday, Plaintiff could:

occasionally lift and/ or carry twenty (20) pounds;  frequently lift and/ or carry ten

(10) pounds; stand and/ or walk for about six (6) hours; sit for about six (6) hours;

engage in unlimited pushing and pulling; occasionally climb ramps, stairs, ladders,

ropes and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl.

(Tr. 67-69).  Dr. Ali explained the following:

> [T]he overall evidence suggests that he has the ability to care
> for himself and maintain his home.  He can walk a distance of 2
> miles.  He received treatment from a specialist for his Spinal
> Stenosis, Bulging Disks and Torn Meniscus Rt. Knee.
> Moreover, he has received various forms of treatment for the
> alleged symptoms.  The record reveals that the treatment has
> generally been successful in controlling those symptoms.
> While he has undergone physical therapy in the past, he is not
> currently attending physical therapy.  Additionally, he does not
> require an assistive device to ambulate.  He does not use a Tens
> unit.  PT/ heating pad/ massage help.  He has been prescribed,
> and has taken, appropriate medications for the alleged
> impairments.  The medical records reveal that the medications
> have been relatively effective in controlling his symptoms.
> Based on the evidence of record, [Plaintiff's] statements are
> found to be partially credible ([normal] ROM [in his] knee
> [joints]/ no use of [an assistive device], [] noted by
> [Consultative Examiner] by walking into office in no apparent
> distress).

(Tr. 69).

On April 12, 2012, Plaintiff had an appointment with Gregory Sachs, D.O.

16

at PCA Family Medicine.  (Tr. 370).  The purpose of his appointment was to have medications refilled, including Percocet, Amlodiphine, and Simvastatin.  (Tr. 370).  Plaintiff complained of right knee pain, back pain, neck pain, and shoulder stiffness.  (Tr. 371).  His current problems list included degenerative disc disease, spinal stenosis of the cervical spine, hyperlipidemia, and hypertension.  (Tr. 370).  His medications list included Lisinopril, Amlodipine Besylate, Cyclobenzaprine, Oxycodone, Simvastatin, Bupropion, and Flexeril.  (Tr. 361).  His physical exam revealed full ROM in all joints.  (Tr. 362).  Plaintiff was scheduled for a follow-up visit.  (Tr. 363).

On May 14, 2012, Plaintiff had an appointment with Dr. Sachs.  (Tr. 361).  He complained of right knee pain, and stated that when he went hunting the prior weekend, he "didn't think he was going to make it out of the woods."  (Tr. 361).  He also complained of back headaches.  (Tr. 361).  His current problem list included: degenerative joint disease; spinal stenosis of the cervical spine; hyperlipidemia; and hypertension.  (Tr. 361).  His medications list included Lisinopril, Amlodipine Besylate, Cyclobenzaprine, Oxycodone, Simvastatin, Bupropion, and Flexeril.  (Tr. 361).  His physical exam revealed full ROM in all joints.  (Tr. 362).  Plaintiff was scheduled for a follow-up visit.  (Tr. 363).

On June 13, 2012, Plaintiff had an appointment with Dr. Sachs.  (Tr. 357).

17

Plaintiff stated that he tried to go back to work after his knee surgery, but that it "[wasn't] going good." (Tr. 357). His current problem list included: chronic migraines; degenerative joint disease; spinal stenosis of the cervical spine; hyperlipidemia; and hypertension. (Tr. 357). His medications list included Lisinopril, Cyclobenzaprine, Oxycodone, and Simvastatin. (Tr. 357). Plaintiff complained of knee pain that had been getting worse since going back to work. (Tr. 358). With regards to the spinal stenosis, Plaintiff stated that after trying to work, he got terrible headaches, neck pain, and upper back pain, and his arm went numb. (Tr. 359). He denied muscle weakness, joint pain, joint swelling, and back pain. (Tr. 358). His physical exam revealed full ROM in all joints. (Tr. 359). Plaintiff was scheduled for a follow-up visit. (Tr. 360).

On June 15, 2012, Plaintiff had an appointment with Dr. Eshbach. (Tr. 350). Plaintiff stated that he had been experiencing intermittent episodes of pain and had been unable to get back to construction work "much to his dismay and financial detriment." (Tr. 350). His exam revealed a moderate effusion, and an x-ray showed significant medial joint space narrowing and degenerative changes compared to prior x-rays. (Tr. 350). Dr. Eshbach noted that it was likely that Plaintiff would eventually need a knee replacement when the symptoms could no longer be managed. (Tr. 350). Dr. Eshbach injected Plaintiff's knee with

18

Marcaine and Depo-Medrol, and Plaintiff was scheduled for a follow-up visit.
(Tr. 350).

On July 11, 2012, Plaintiff had an appointment with Dr. Eshbach.  (Tr. 351).
Plaintiff stated that he had been feeling much better with occasional twinges in his
knee that were infrequent and mild.  (Tr. 351).  Plaintiff was noted to be "walking
quite well."  (Tr. 351).

On September 17, 2012, Plaintiff had an appointment with Dr. Sachs.  (Tr.
353).  His problem list included: anxiety; insomnia; depression; chronic migraines
without aura; degenerative joint disease; spinal stenosis of the cervical spine;
hyperlipidema; and hypertension.  (Tr. 353).  His medications list included
Lisinopril, Cyclobenzaprine, Oxycodone, and Simvastatin.  (Tr. 353).  It was
reported that he was not in pain.  (Tr. 354).  His physical exam revealed full ROM
in all his joints.  (Tr. 355).  He was instructed to continue taking his medications.
(Tr. 355-356).

On November 20, 2012, Plaintiff had a follow-up appointment with Dr.
Eshbach.  (Tr. 380).  His appointment was for paperwork verification for disability
with regard to his right knee degenerative joint disease.  (Tr. 380).  His exam
revealed that his knee had no effusion and that Plaintiff was getting by
"reasonably well, such that [Dr. Eshbach] [saw] no indication for an injection at

19

[that] point. . ."  (Tr. 380).  Dr. Eshbach filled out the Disability form, and indicated that Plaintiff would occasionally require breaks during a work day in excess of the ususal fifteen (15) minute morning and afternoon break and the thirty (30) minute lunch break due to increased symptoms of chronic pain, difficulty walking on uneven surfaces, swelling, and sharp pains.  (Tr. 381).  Dr. Eshbach also stated that Plaintiff experienced approximately five (5) bad days per month during which his symptoms were increased, and they he would not be able to complete an eight (8) hour work shift.  (Tr. 381).  He opined that, in an eight (8) hour workday, Plaintiff could stand/ walk for two (2) hours, sit for three (3) hours, and lift up to ten (10) pounds.  (Tr. 381).  Dr. Eshbach included a torn meniscus and degenerative joint disease in Plaintiff's right knee as Plaintiff's diagnosis on this form.  (Tr. 381).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, including supplemental security income, the

plaintiff must demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. §

432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).  "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. "  Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## ALJ DECISION

Initially, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2015, the date of last insured.  (Tr. 15).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of July 21, 2011.  (Tr. 15).

At step two, the ALJ determined that Plaintiff suffered from the severe[8] combination of impairments of the following: "C5 degenerative disc disease with moderate narrowing at C5-C6, C5-C6 stenosis, disco bulging at C5-C6 and C5-C7 with episodic radiculopathy, status post a right knee meniscal tear, bilateral ankle and foot spurs, insomnia, migraine headaches, obesity, anxiety, and depression (20 C.F.R. 404.1520(c) and 416.920(c))."  (Tr. 15).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

─────────────────────

8. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. 16).

At step four, the ALJ determined that Plaintiff had the RFC  to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that:

> [Plaintiff] is limited to occasional walking and standing. [Plaintiff] must avoid kneeling, crouching, crawling, and climbing ladders, ropes, and scaffolds.  He can occasionally perform other postural maneuvers.  He must be afforded the option to sit and stand during the workday, one to two minutes every thirty minutes or so.  He must avoid pushing and pulling with extremities.  He is limited to occupations which do not require exposure to dangerous machinery and unprotected heights due to narcotics usage.  He is limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes.

(Tr. 18).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the his age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))."  (Tr. 24-25).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between July 21, 2011, the alleged onset

date, and the date of the ALJ's decision.  (Tr. 25).

## **DISCUSSION**

On appeal, Plaintiff asserts the following arguments: (1) the ALJ erred in violation of the treating physician rule by failing to appropriately evaluate the opinion of Dr. Eshbach; (2) the ALJ erred in its credibility determination of Plaintiff; and (3) the ALJ erred in concluding Plaintiff could perform light work because "a person limited to only occasional standing/ walking can only be found capable of sedentary work."  (Doc. 13, pp. 3-20).  Defendant disputes these contentions.  (Doc. 14, pp. 9-24).

### **1.    Dr. Eshbach's Opinion**

Plaintiff argues that the ALJ erred in evaluating Dr. Eshbach's opinion because: (1) it was consistent with the record; and (2) the ALJ gave no consideration to the factors that define a treating physician set forth in 20 C.F.R. § 416.927(d)(1)-(d)(6).  (Doc. 13, pp. 9-19).  More specifically, Plaintiff argues: (1) the record demonstrates that Plaintiff's knee condition was worsening and progressive; (2) the ALJ speculated Plaintiff's activities of daily living when he over-stated the details of Plaintiff's hunting trips; (3) the ALJ's conclusion that Dr. Eshbach's opinion was inconsistent with the record was based on a lay opinion, rather than a medical one; and (4) the ALJ should have scheduled a

27

consultative examination or had a medical expert testify at the hearing.  (Doc. 13, pp. 16-19).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason."  Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.  See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961

(3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight.  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted).  "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review."  In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

In his opinion, the ALJ admits that Dr. Eshbach is a treating physician based on the factors listed in 20 C.F.R. § 416.927(d)(1)-(d)(6)[9], but declined to give Dr.

---

9. The factors to be applied to determine the appropriate weight to be given to the treating physician's opinion are: (1) length of treatment relationship and frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion by relevant evidence or explanation, (4) consistency of the opinion with the record as a whole, (5) whether the treating physician is a specialist, and (6) other factors which tend to support or contradict the opinion. See 20 C.F.R. § 416.927(d)(1)-(d)(6).

Eshbach's opinion controlling weight. (Tr. 23). The ALJ explained that Dr. Eshbach's opinion rendered in disability papers filled out on November 14, 2012 was inconsistent with his last progress notes, more specifically, that Plaintiff's knee had no effusion, that he was getting by reasonably well, and that he did not need another injection. (Tr. 23).

Additionally, the ALJ pointed to other notes from Dr. Eshbach that the ALJ stated were inconsistent with his November 14, 2012 opinion, including the following: (1) Dr. Eshbach cleared Plaintiff to return to work two (2) months after surgery in November of 2011; and (2) at a July 2012 appointment, Plaintiff reported to Dr. Eshbach that he was feeling much better, and Dr. Eshbach reported that Plaintiff could do reasonably well with his knee condition and only needed to see him on an as needed basis. (Tr. 23). The ALJ also discussed how Plaintiff's self-reported activities of daily living, including hunting and lawn mowing, were inconsistent with Dr. Eshbach's opinion, as was the totality of evidence. (Tr. 23).

Instead, the ALJ gave significant weight to the opinion of Dr. Suvarnakar because he directly examined Plaintiff, and rendered an opinion regarding Plaintiff's functional limitations that was consistent with the objective and clinical findings of the record, and was not otherwise inconsistent with other substantial evidence contained in the case record. (Tr. 22). The ALJ also gave significant

30

weight to the opinion of the state agency physician because it was consistent with

and supported by the medical evidence.  (Tr. 22).

   In evaluating the weight the ALJ afforded to these opinions, and in

consideration of the standard of review, which is whether substantial evidence

supports the ALJ's decision, it is concluded that the ALJ did not err in not giving

controlling or significant to Dr. Eshbach's opinion, and the ALJ also adequately

discounted this opinion, because it was inconsistent with the record.  As noted by

the ALJ, and as noted in Dr. Eshbach's own progress notes, Plaintiff stated he was

doing reasonably well and was feeling much better on several occasions.  (Tr.

380).  Dr. Eshbach noted, in July of 2012, that Plaintiff did not need to return for

an injection of his knee, and only needed to be seen on an "as needed" basis.  (Tr.

380).   From July 2012 to November of 2012, Plaintiff did not return to see Dr.

Eshbach.  As stated in Dr. Eshbach's examination notes from Plaintiff's November

14, 2012, visit:

> This patient came in today somewhat for paperwork
> verification for disability with regard to his right knee DJD.
> Papers were filled out and signed.  His knee has no effusion at
> this point and he is getting by reasonably well, such that I see
> no indication for an injection at this point, but he is to get back
> on a PRN basis now.

(Tr. 380).  Furthermore, in terms of activities of daily living, Plaintiff stated he

was able to engage in the following: walking two (2) miles; hunting; fishing; taking care of his sun; riding a lawnmower to mow the grass; playing with his son, doing his laundry; cooking; tending to her personal needs; cleaning the house, including dusting and sweeping; visiting his parents; shopping; driving; reading the newspaper; watching television; and paying bills.  (Tr. 22).

Regarding Plaintiff's argument that the ALJ relied on "lay opinion" in determining that Dr. Eshbach's opinion was inconsistent with the record, it is determined that the ALJ did not rely on his own or another non-medical person's opinion in determining Plaintiff's RFC, but rather relied on and gave significant weight to the opinions of two (2) medical physicians in analyzing Plaintiff's RFC, including Dr. Suvarnakar and Dr. Ali, the state agency physician, whose opinions were consistent with the record.  Furthermore, in determining the weight to be afforded to the medical opinions, the ALJ also relied on progress notes from Dr. Eshbach that contradicted his November 14, 2012 disability form opinion and instead supported the opinions of Dr. Suvarnakar and the state agency physician. (Tr. 22-24).  Therefore, upon review of the record and in accordance with the substantial evidence standard of review, the ALJ did not err in giving significant weight to the opinions of Dr. Suvarnakar and the state agency physician because they were consistent with the record and Plaintiff's self-reported activities of daily

living.

Regarding Plaintiff's assertion that the ALJ had a duty to order a consultative examination of Plaintiff or to have a medical expert testify at Plaintiff's hearing, it is well-established that the plaintiff retains the burden of developing the record.  The ALJ had no duty to further develop the record regarding the medical opinion evidence because Plaintiff retains the burden of proving his disability.  20 C.F.R. §§ 404.1512, 1513(d); see Rutherford v. Barnhart, 399 F.3d 546, 551 (3d Cir. 2005).

As such, substantial evidence supports the weight the ALJ afforded to these physicians' opinions, including the opinion of Dr. Eshbach, and also supports the ALJ's reasoning for discounting Dr. Eshbach's opinion.

## 2.    Plaintiff's Credibility

Plaintiff challenges the credibility determination of the ALJ because the ALJ failed to mention Plaintiff's strong work history in arriving at Plaintiff's credibility determination.  (Doc. 13, p. 20).  Plaintiff highlights that, according to SSR 96-8p, one (1) of the factors an adjudicator should consider when evaluating credibility is his prior work record.  (Id.).  Plaintiff asserts that his work history "argues against the possibility of malingering and certainly ought to have been considered in the ALJ's credibility assessment."  (Id.).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." Frazier v. Apfel, 2000 WL 288246 (E.D. Pa. 2000) (citing Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997)); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility."). The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. § 404.1529. First, symptoms, such as pain, shortness of breath, fatigue, etcetera, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b). Once a medically determinable impairment that results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. 20 C.F.R. § 404.1529(b). In so doing, the medical evidence of record is considered along with the claimant's statements. 20 C.F.R. § 404.1529(b). Social Security Ruling 96-7p gives the following instructions in evaluating the credibility

of the claimant's statements:

> In general, the extent to which an individual's statements about
> symptoms can be relied upon as probative evidence in
> determining whether the individual is disabled depends on the
> credibility of the statements.  In basic terms, the credibility of
> an individual's statements about pain or other symptoms and
> their functional effects is the degree to which the statements
> can be believed and accepted as true.  When evaluating the
> credibility of an individual's statements, the adjudicator must
> consider the entire case record and give specific reasons for the
> weight given to the individual's statements.

SSR 96-7p.

The ALJ discussed all evidence relating to Plaintiff's medically

determinable impairments and the symptoms Plaintiff alleged these impairments

caused.  (Tr. 18-21).  Ultimately, based on review of Plaintiff's subjective

complaints and the medical evidence of record, the ALJ concluded that Plaintiff's

statements concerning the intensity, persistence, and limiting effects were not

entirely credible.  (Tr. 21).  In arriving at this credibility determination, the ALJ

discussed the fact that Plaintiff testified that he was capable of doing the

following: walking two (2) miles; hunting; fishing; taking care of his sun; riding a

lawnmower to mow the grass; playing with his son, doing his laundry; cooking;

tending to her personal needs; cleaning the house, including dusting and

sweeping; visiting his parents; shopping; driving; reading the newspaper;

watching television; and paying bills.  (Tr. 22).

By evaluating the extent to which Plaintiff's subjective complaints were reasonably consistent with the objective medical evidence, the credibility analysis was proper.  See Blue Ridge Erectors v. Occupational Safety & Health Review Com'n, 261 Fed. Appx. 408, 410 (3d Cir. 2008) (quoting St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005) ("[T]he ALJ's credibility determinations should not be reversed unless inherently incredible or patently unreasonable.")).  While Plaintiff argues that the ALJ erred in his credibility analysis because he failed to mention Plaintiff's strong work history, it is well-established that the ALJ need not address every piece of evidence in the record. Hur v. Barnhart, 94 Fed. Appx. 130, 133 (3d Cir. 2004); see Johnson v. Commissioner of Social Sec., 529 F.3d 198, 204 (3d Cir. 2004) (An ALJ may not reject pertinent evidence without explanation, but does not need to cite all evidence the claimant presents).  Therefore, while Plaintiff's work history was one (1) factor out of many in determining his credibility, the ALJ was under no duty to discuss this history in his decision.  As such, the ALJ's credibility analysis is supported by substantial evidence and will not be disturbed on appeal.

### 3.   Plaintiff's Residual Functional Capacity

In his appeal, Plaintiff argues that, assuming the RFC is correct, the ALJ did

not meet his step five burden of showing that there was other work he could perform because a person limited to only occasional standing and walking can only be found capable of sedentary work.  (Doc. 13, pp. 4-9).  Plaintiff argues, under SSR 83-10, occasional standing/ walking involves up to one-third of an eight (8) hour workday, and that light work requires that Plaintiff stand/ walk for a time period greater that provided by the definition of occasional standing/walking. Plaintiff argues that his inability to perform each of the light work specifications, specifically those regarding standing/ walking as defined by SSR 83-10 and 20 C.F.R. §§ 404.1567(b), 416.967(b), means that he should automatically be placed in the sedentary category.  Plaintiff cites Campbell v. Astrue, a case from the United States District Court for the Eastern District of Pennsylvania, which held that Plaintiff's ability to walk up to only two (2) hours limited him to sedentary work.  2010 U.S. Dist. LEXIS 143997 (E.D. Pa. Nov. 2, 2010).

However, SSR 83-10 describes the full range of light work as involving standing or walking frequently, which is defined as existing as little as one-third of the time.  According to the RFC, Plaintiff was capable of occasional walking/ standing, which Plaintiff concedes equates to up to one-third of an eight (8) hour work day.  Therefore, the standing/ walking required for a full range of light work (as little as one-third of an eight (8) hour workday) is potentially equal to

37

Plaintiff's ability to engage in occasional standing/ walking (as much as one-third of an eight (8) hour workday), depending on the light work job involved.

Furthermore, in <u>Campbell</u>, the court failed to emphasize that 20 C.F.R. §§ 404.1567(b), 416.967(b) and SSR 83-10 provide requirements for a full range of light work, not a limited range of light work.  In the case at hand, the ALJ made it clear that Plaintiff, while able to engage in light work, was limited in a multitude of ways; thus, Plaintiff was able to engage in a limited range of light work.  (Tr. 18).  Because Plaintiff could not perform the full range of light work, the ALJ appropriately consulted the VE in accordance with SSR 83-12, and included all of the RFC limitations in his hypothetical, including that Plaintiff was limited to only occasional standing/ walking.  (Tr. 56-57).  The VE, in considering the RFC limitations, concluded that Plaintiff could perform the following limited range of light work jobs: weigher scales operator; small parts assembler; and an inspector position.  (Tr. 57-58).

Moreover, the Third Circuit Court of Appeals has previously upheld an ALJ's conclusion that, where a plaintiff is limited to no more than two (2) hours of standing or walking, the plaintiff had the capacity to perform a limited range of light work.  <u>Young v. Astrue</u>, 519 F. App'x 769, 771 (3d Cir. 2013).  As such, substantial evidence supports the ALJ's determination that Plaintiff could perform

a limited range of light work with certain functional limitations.

## CONCLUSION

Based upon a thorough review of the evidence of record, this Court finds that the Commissioner's decision is supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be denied, and the decision of the Commissioner will be affirmed.

A separate Order will be issued.

**Date**: February 27, 2015

**/s/ William J. Nealon**
**United States District Judge**